BUCKEYE ENGINE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CLEVELAND MACHINE & MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 942, 1762.  Promulgated March 30, 1928.

*Carmi A. Thompson, Esq., Orville Smith, Esq.*, and *Stephen G. Rusk, C. P. A.*, for the petitioners.
*John D. Foley, Esq.*, for the respondent.

322

328

## OPINION.

LOVE: The first contention advanced by the petitioner, the Buckeye Engine Co., is that, in the year 1920, it sold to the E. W. Bliss Co. by separate and distinct sales, certain personal property, by bill of sale, for the sum of $300,000 paid in cash in that year, and certain real estate for $1,200,000 by land contract with payments to be made on the installment basis. It is further contended that the sales of the personal and real property having been made separately, the profit on such sales should be computed accordingly, and in this respect petitioner urges that in computing the profit derived from the

sale of the personalty the amount of $12,190.05 should be added to the cost thereof as that amount was erroneously excluded therefrom.

The Commissioner, on the other hand, denies that the property, both real and personal, was sold by separate and distinct sales, the personalty being sold for $300,000 and the realty for $1,200,000. On his behalf, it is contended that the property, both real and personal, was sold as a whole, at one time and by the same transaction, or in other words, there was a lump-sum sale of all of the property, real and personal, for $1,500,000.

In support of its contention as to the distinct and separate sale of realty and personalty, the petitioner advances the following grounds, any one of which, it is urged, is sufficient to sustain the contention made:

First. All of the property, real and personal, subject to the sales in question, was located in the State of Ohio, and the parties were contracting in contemplation of the laws of Ohio and that under the statutes thereof and the decisions of the courts therein, the sales did not take place until the actual delivery of the bill of sale and land contract.

Second. The parties to the agreement of July 16, 1920, did not expect or intend that it should be the full and final agreement between them and that the agreement indicated on its face that the conditions and terms not covered thereby could be worked out later.

Third. Admitting that the agreement of July 16, 1920, constituted an instrument of sale and that the parties so intended it to be, then, nevertheless, the parties entirely abandoned the plan set forth in that agreement and consummated the sale of the property in an entirely different manner, to wit, separate and distinct sales of realty and personalty, as alleged by petitioner.

Although there is nothing in the record indicative of the intention of the parties with respect to the laws of the State under which they were contracting, and while the formalities of the contract are usually governed by the law where the contract is made, and the rights and obligations of the parties thereto depend to some extent upon the subject matter thereof, whether movables or immovables, in the instant case whether the contract is governed by the law where the contract was made or the law where the property is situated, we are not concerned with these considerations. There has been no question raised as to the validity or nature of the agreement of July 16, 1920, that is, whether it was a contract of sale or for sale. It is apparent, and we so hold, that the agreement reached on July 16, 1920, constituted a *contract for sale* and not *one of sale* as there was no present intention to vest title in the subject matter thereof in the purchaser.

This we take to be true irrespective of any question as to a conflict of laws.

It is urged by petitioner that the sales, alleged to be separate, did not take place until the actual delivery of the bill of sale and the land contract on August 13, 1920, and that on that day the personal property was sold for $300,000 because of the delivery of the bill of sale. In support of this argument, section 8381, General Code of Ohio, is cited. This section defines a sale of goods as follows:

A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.

We agree that the sale herein in question took place on August 13, 1920, at which time the petitioner divested itself of title to the property, both real and personal, but we are unable to state that the mere fact that a delivery of the bill of sale for the personalty was made is conclusive evidence that the consideration thereof was $300,000, the amount paid on that day.

The second ground in support of its contention as to separate sales of realty and personalty, advanced by petitioner is that the parties to the agreement reached on July 16, 1920, did not intend that it should be the full and final agreement but, on the contrary, it was agreed that terms and conditions not covered thereby would be worked out.

We agree that such was the case and we have found it to be a fact. Some of the details later agreed upon are set forth in the findings of fact herein. However, that brings us squarely to the point at issue, did the parties before August 10, 1920, the time of executing the bill of sale covering the personalty, agree that the personalty covered thereby was to be transferred in consideration of $300,000 and did the parties on August 13, 1920, consider and intend that the amount of $300,000 be the consideration or the price for the personalty conveyed by the bill of sale?

A consideration of petitioner's third ground will, in our opinion, answer the question just asked. The third ground is that before the sale on August 13, 1920, the parties entirely abandoned the plan described in the agreement of July 16, 1920, and consummated the sale in an entirely different manner. Briefly restated, it is the petitioner's position that between July 16, 1920, and August 13, 1920, an agreement was reached whereby the realty was transferred in escrow for $1,200,000 and a separate sale was made of the personalty for $300,000. We must, therefore, look to the agreement of July 16, 1920, the circumstances and conditions surrounding its execution, and the subsequent action of the parties, as disclosed by the record, in order to ascertain the manifest intention of the parties, as the question as to whether the contract for sale was severed is a question

of intent, which intent may be indicated but not determined by the measuring of the consideration by units.

It will be observed that, under the agreement of July 16, 1920, the petitioner covenanted to convey to E. W. Bliss Co. " all of its real estate located in Salem * * * together with all buildings and their equipment, and all machinery and small tools excepting four special machines * * * together with the good will of the Company in the manufacture of power presses * * * now manufactured by E. W. Bliss Company * * *," for a total consideration of $2,500,000, payable in installments, the first of which was to be $500,000. It will be further observed that the agreement provided for the conveyance in escrow of the real property only.

By his letter of August 2, 1920, petitioner's president provided that the first payment of $500,000 should be apportioned $300,000 to the Buckeye Engine Co. and $200,000 to the Cleveland Machine & Manufacturing Co. All future payments were to be apportioned in the same ratio of 60 per cent and 40 per cent between the two companies.

On August 13, 1920, the realty was conveyed in escrow and the bill of sale covering the personalty was delivered and payment of $500,000, divided as directed, was made. In the underscored portion of the bill of sale set out in the findings of fact, the petitioner evinced an intention to sell all of its realty and personalty and " all of the business and good will of the grantor as a going concern, so far as the same relates in any way to the manufacture of power presses, steam hammers, and sheet metal working machinery."

After careful consideration of all of the evidence adduced, the Board is of the opinion that the petitioner intended to sell and the Bliss Company intended to buy the real and personal property as a whole, at one time and by the same transaction. The agreement of June 16, 1920, expresses no intention to sell personalty and good will as separate things. The first payment of $500,000, divided as directed, was determined without reference to the different assets sold. There is nothing in the record to indicate that any attempt was made to segregate the different assets sold and to place a price on each, or even to segregate the first payment as between realty and personalty. The bill of sale did not evince an intention to sell personalty, tangible and intangible, separately and for $300,000. The opinion of the parties as to how many contracts they have made, or whether they have made any, is immaterial, as we believe the uncontroverted facts show clearly that there was a single offer and assent to the agreement of July 16, 1920, which remained unmodified. In this connection we consider of no importance the bookkeeping entry made some time subsequent to the transaction. Accordingly,

we approve the Commissioner's determination that petitioner's assets, real and personal, were sold pursuant to one contract for $1,500,000 on an installment basis.

Our decision in respect of the issue just presented disposes of petitioner's second and third contentions, namely, that it is entitled to deductions for amortization for the years 1918 and 1919 and that it failed to include the amount of $12,190.05 in the cost of the personalty sold. Inasmuch as the amount of $12,190.05 was reflected in another account it was also properly reflected in determining the gain from the lump-sum sale of the assets sold and having held that petitioner's assets, real and personal, were sold in a lump-sum sale and not separately, it can not be said that any given portion of the consideration was paid for realty and the remainder for personalty. Being unable to allocate any given portion of the purchase price to personal property, which included amortizable as well as nonamortizable assets, it logically follows that it can not be said that the amortizable property was not sold for an amount in excess of its cost since the selling price of all of the assets exceeded their cost.

The fourth contention advanced by the petitioner is that the Commissioner failed to allow adequate deductions for depreciation and obsolescence on machinery and equipment for the years 1918, 1919, and 1920. No evidence, however, was adduced in support of this contention as to the year 1920, and accordingly, the Commissioner's determination in regard thereto is approved.

Normally the petitioner's machinery and equipment was operated 55 hours a week, machinery depreciating at the rate of 5 per cent annually, and equipment at 10 per cent annually.

During the first 6 months of 1918 the plant was operated 125 hours per week and during the last 6 months thereof and during all of 1919 it was operated 150 hours per week. During these years, while the plant was operated almost continuously, due to labor conditions, unskilled and inefficient employees were handling the machinery and equipment on materials for which to some extent, it was not suited. Breakdowns were numerous and only such repairs were made as kept the plant in operation and the repairs so made were costly by reason of high wages.

In computing the allowance for depreciation for the years 1918 and 1919, the petitioner used as a basis for its computations the appreciated value of its machinery and equipment which it had in 1918 placed on its books. In addition, it charged off in each of the years 1918 and 1919 an amount for obsolescence of drawings and patterns. The Commissioner, upon audit of the returns, allowed depreciation at the rate of 10 per cent normal and 5 per cent additional depreciation for overtime operation, a total of 15 per cent on machinery and equipment for 1918 and 1919, the basis for com-

puting the deductions, that is, whether on appreciated value or otherwise, not being disclosed. However, the deductions so computed by the Commissioner were less than those computed by petitioner and accordingly the amount thereof for the respective years was reduced in accordance with the Commissioner's determination.

The evidence adduced fails to establish that any of petitioner's patterns and drawings became obsolete in 1918 or that it was entitled to any deduction for obsolescence in that year. However, the record discloses that the deduction for depreciation and obsolescence for 1918 was "raised quite largely" on account of patterns charged off as obsolete. As to the amount of the deduction so taken or the basis thereof, the record is silent.

For the year 1919, petitioner took a deduction for obsolescence of patterns and drawings, the amount of which is not disclosed. During that year, however, some of the patterns and drawings were actually destroyed, the depreciated cost thereof being, of course, a proper deduction. But, on the record as made, it is impossible to tell how much, if any, of the deduction for obsolescence was erroneously taken or the depreciated cost of the patterns and drawings actually destroyed.

The Commissioner's determination of a "reasonable allowance" for depreciation and obsolescence for the years 1918 and 1919 carries with it the *prima facie* presumption of correctness, and in order that we may disturb his determination in regard thereto, the burden is on the petitioner to rebut the presumption of the correctness of that determination. *Mandel Brothers*, 4 B. T. A. 341.

There was no evidence adduced as to the cost or March 1, 1913, value of machinery and equipment acquired prior thereto, or as to the cost of machinery and equipment acquired subsequent thereto. There is not one word in the record concerning the basis or amount of the deductions taken for obsolescence, which, at least, as to 1918 was clearly erroneous. There is evidence, however, conclusively establishing the fact that the petitioner, in computing the deductions for depreciation for 1918 and 1919, used an improper basis therefor, namely, an appreciated value of machinery and equipment. We do not know the basis used in determining the deductions for obsolesence.

It is obvious, therefore, that because of the lack of evidence as to the essential elements upon which the deductions for depreciation and obsolesence must be computed, we are unable to determine the proper allowance therefor for the years in question. On the record, we can only approve the Commissioner's determination, which, as before stated, is *prima facie* correct. Consequently, it is approved.

Petitioner's remaining contention is that the Commissioner improperly excluded from invested capital for the year 1918 the

amount of $2,800 representing a reserve for 1917 Federal income and profits taxes. The Commissioner concedes error in this respect and, accordingly, invested capital for 1918 should be increased by the amount erroneously excluded.

Reviewed by the Board.

> As to the Buckeye Engine Co., judgment will be entered on 15 days' notice, under Rule 50. As to the Cleveland Machine & Manufacturing Co., the deficiency for the year 1920 is $51,662.19.

ARUNDELL and VAN FOSSAN did not participate.